FIDO'S FENCES, INC., Plaintiff,

v.

The CANINE FENCE COMPANY, Defendant.

No. CV 08–754.

United States District Court, E.D. New York.

Nov. 30, 2009.

Law Offices of P.B. Tufariello, P.C. by Panagiota Betty Tufariello, Esq., Mt. Sinai, NY, Weinberg, Gross & Pergament LLP by Marc A. Pergament, Esq., Garden City, NY, for Plaintiff.

Finn Dixon & Herling by Patrick J. McHugh, Esq., Stamford, CT, LArusso & Conway, LLP by Joseph P. Conway, Esq., Mineola, NY, for Defendant.

### MEMORANDUM AND ORDER

WEXLER, District Judge.

This is an action alleging breach of contract, unfair competition, deceptive acts and practices, tortious interference with business relations, and antitrust violations. Presently before the court is Defendant's motion for summary judgment dismissing the antitrust causes of action.

### BACKGROUND

#### I. *The Parties and the Pleadings*

Plaintiff Fido's Fences, Inc. ("Fido's"), was a long time retail seller, and installer of electronic pet containment systems distributed by the Defendant, the Canine Fence Company ("Canine"). When the parties' business relationship was threatened by Fido's non-payment of monies allegedly due to Canine, Fido's sued Canine.

The case was commenced by Fido's in New York State Court, and thereafter removed to this court by Canine. Plaintiff's initial complaint alleged only state law causes of action for breach of contract, unfair competition, violations of Sections 349 and 350 of the New York General Business Law, and tortious interference with business relations. Defendant denied the material allegations of the complaint, and set forth affirmative defenses, as well as counterclaims.

After removal and a significant amount of discovery, Plaintiff amended its complaint to add several causes of action sounding in antitrust violations. It is those causes of action, stated pursuant to the Federal Sherman and Clayton Acts, as well as state law, that are the subject of the present motion for summary judgment.

#### II. *Prior Proceedings*

Although this case is before the court in the context of a motion for summary judgment, the case has been pending, decisions have been issued, and discovery ongoing, for more than a year. The facts below have been established by those proceedings.

Canine is the exclusive distributor of an electronic enclosure system for animals known as the "Invisible Fence System." Fido's and Canine were parties to an agreement pursuant to which Fido's was granted the rights to market, sell and install Canine's Invisible Fence System. The parties' original dealership contract was dated June 30, 1989. That contract was replaced by a contract dated December 1, 1996 (the "1996 Contract"). The 1996 Contract was renewed over the years of the parties' business relationship. It provides for termination upon written notice if, *inter alia*. Fido's defaults in payment and/or fails to conform to Canine's credit terms or policies. The 1996 Contract further provides that upon termination of the dealership, neither party is entitled to "any compensation or reimbursement for loss of prospective profits, anticipated sales or other losses occasioned by termination of the relationship."

In addition to the terms referred to above, the 1996 Contract contains a noncompete provision. This section of the agreement provides that a terminated dealer shall not, without the written consent of Canine, engage in a competing invisible barrier type of business for a two year period, nationwide, following termination of the agreement. Finally, the 1996 Contract provides that no custom or practice at variance with its terms shall constitute a waiver of Canine's rights under the agreement.

The 1996 Contract imposes no restrictions on either Fido's or Canine with respect to the geographic area in which either may do business. Canine was authorized to extend use of the Invisible Fence trademark, and to enter into licensing agreements with other dealers. Additionally, there is no provision that would limit Canine's ability to establish itself as a direct dealer in its own product. Nor is there any limitation on Fido's with respect to the geographic market in which it might do business. Despite the absence of any geographic restriction, Fido's limited its business to the Long Island areas of Nassau and western Suffolk counties. It also appears that Fido's did a limited amount of business in New York City, specifically in the boroughs of Queens and Brooklyn. Although, as noted, Canine had the right to compete with Fido's in the areas in which it did business, or authorize additional distributors in those areas, it did not exercise those rights during the time of the parties' business relationship.

In May of 2007, Fido's was informed that it owed Canine in excess of $77,000. Fido's was further informed that over $26,000 of that amount was in excess of twenty days past due. Thereafter, on May 25, 2007, Canine sent notice to Fido, and its other dealers, that it intended to enforce the payment terms and conditions of its dealer contract. In September of 2007, Fido's remained in violation of the credit terms of its agreement with Canine. At that time, over $19,000 (of the more than $69,000 due to Canine), was in excess of thirty days overdue. By December of 2007, over $40,000 was past due from Fido's to Canine.

Documents before the court indicate that Canine repeatedly informed Fido's of the delinquency of its account, but Fido's failed to bring the account up to date in an accord with the 1996 Contract. On January 17, 2008, Fido's requested that Canine provide it with equipment, but also advised Canine that it could not pay for that equipment. Canine refused to provide any additional equipment or credit to Fido's. Fido's was given five days in which to bring its account with Canine up to date. Still, over $20,000 remained past due and

owing to Canine. While Canine did not immediately terminate the 1996 Contract at that time, it did put Fido's account "on hold," and refused to supply additional material to Fido's. Instead of paying Canine the money owed, Fido's commenced this action seeking injunctive relief. Fido's motion sought to require Canine to continue to do business with Fido's and/or to allow Fido's to do business with a competitor of Canine.

This court denied Fido's request for injunctive relief, holding that it failed to show the necessary irreparable harm. In its denial, the court noted that this is a breach of contract case that can compensated by money damages. It was further noted that Fido's did not dispute that it owed money to Canine, but sought, at the time, to continue to do business with Canine, despite its default.

After denying the preliminary injunction, the case was again before this court when an issue arose as to Fido's continuing use of a telephone number. Canine argued that since Fido's was no longer an authorized dealer of its Invisible Fence product, callers to the number should be directed to Canine, and not to Fido's, which was beginning to distribute the product of a Canine competitor. In the context of that motion, the court ruled that telephone calls made to Fido's Fences would be routed to an independent answering system that would direct callers to press a certain number to reach an authorized provider of the Invisible Fence system, or a different number to contact Fido's Fences.

At the present time, Fido's is no longer authorized to deal in Canine's Invisible Fence product. Canine is now servicing Invisible Fence clients in the area formerly serviced by Fido's. Fido's has begun to sell a product that competes directly with Canine in the same geographic area where it previously sold Canine's product. Canine takes the position that this activity is in direct violation of the non-compete provision of the 1996 Contract. As far as the court can tell, Fido's continues to owe a substantial amount of money to Canine in connection with products purchased when Fido's was an authorized dealer in Canine's product.

### III. The Antitrust Claims

As discovery in this matter was coming to a close, Plaintiff amended the complaint to allege the antitrust causes of action referred to above. As noted, those causes of action are pursuant to the Sherman Act, Clayton Act and state law. The court now reviews the facts alleged in support of those claims.

#### A. The Alleged Relevant Market

The relevant business market described in the Amended Complaint is the market for "electronic pet containment systems." That market is alleged to include the installation of those systems. Such services are described as provided primarily to dog owners "for the purpose of allowing their dogs to freely run and cavort within a particularly designated territory, while at the same time preventing them from running into busy streets." Plaintiff alleges that the electronic pet containment system is comprised of "unique components [and] special characteristics" that are without other equivalents or substitutes in the market. The relevant geographic market is alleged as the Northeastern United States, among at least seven states, including New York and Connecticut. The relevant time period alleged covers December 1, 1996, through the present.

#### B. The Alleged Anti–Competitive Conduct

Plaintiff's antitrust complaint outlines certain allegedly anti-competitive practices

as between Canine and its exclusive dealers, as well as a provision that binds customers who purchase Canine's Invisible Fence system.

The bulk of the facts alleged in support of Fido's antitrust claims emanate from the parties' dealership agreement. Essentially, Fido's alleges that the agreement between the Fido's and Canine, which designates Fido's as a dealer in Canine products, is anti-competitive because, while not an exclusive distributorship, it contains certain exclusive provisions, as well as a covenant not to compete upon termination of the agreement. The specific provisions alleged to violate the antitrust laws are:

- the requirement that Canine dealers purchase all of their pet containment systems from Canine;
- the requirement that Canine dealers purchase all replacement components from Canine;
- the requirement that Canine dealers refrain from selling pet containment systems of companies other than Canine;
- the provision that dealers not compete with Canine for a two year period following termination of the dealership agreement (the "non-compete clause").

As to purchasers of Canine's pet containment systems, Fido's alleges that the antitrust laws against tying are violated by Canine's conditioning of its warranty upon the requirement that system replacement batteries be purchased only from Canine.

Fido's does not specify that Canine conspired with competing providers of pet containment systems. Instead, it appears that any claim of conspiracy refers to meetings within Canine wherein certain allegedly anti-competitive strategies were discussed. According to Fido's, it was Canine's anti-competitive strategy to encourage its dealers to establish a business, only to have that business taken away so that

Canine could assume the position of dealer, and thereby increase its market share and power.

### IV. The Motion for Summary Judgment

In support of its motion for summary judgment, Canine argues that Fido's lacks standing because it cannot allege antitrust injury or a proper relevant market. Even assuming that Fido's can establish these elements, it is argued that its antitrust claims fail on the merits, as a matter of law. The court turns to the merits of the motion.

### DISCUSSION

### I. Legal Principles

#### A. Antitrust Standing and the Termination of Distributorship Agreements

██ To have standing to pursue an antitrust action, a plaintiff must show that defendant's conduct results in "antitrust injury," and that the plaintiff will be an "efficient enforcer" of the antitrust laws. *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,* 507 F.3d 117, 121 (2d Cir. 2007). The requirement that a plaintiff show "antitrust injury" recognizes the fact that the antitrust laws are intended to "protect *competition,* not *competitors.*" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (emphasis in original). Thus, an antitrust plaintiff must show "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market. . . ." *George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998), quoting, *Capital Imaging v. Mohawk Valley Med. Assoc.,* 996 F.2d 537, 543 (2d Cir. 1993). Individual harm to the plaintiff as a competitor is insufficient to allege anticompetitive injury. *Id.*

The standing requirement has been applied in cases where a plaintiff alleges that the unlawful termination of a distributorship agreement violates the antitrust laws. As to the question of whether or not exclusive dealerships violate the antitrust laws, the law is clear that, such arrangements, standing alone, are not unlawful. *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir.1999) ("exclusive dealership arrangements are presumptively legal"); *George Haug*, 148 F.3d at 140 n. 1. Instead, where a plaintiff complains about the terms of an exclusive distributorship, the requirement of showing antitrust injury focuses, as in all antitrust cases, on whether the relationship at issue has an anti-competitive effect on the market. *Id.* Where a plaintiff can establish nothing more than its own termination, the complaint falls short of alleging antitrust injury and is properly dismissed. *See, e.g., Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.1978); *S.W.B. New England. Inc. v. R.A.B. Food Group, LLC*, 2008 WL 540091 *6 (S.D.N.Y.2008).

It is well established that the antitrust laws do not restrict the right of a private manufacturer or distributor of a product to decide with whom it will deal. These decisions are independent business decisions that generally do not violate the antitrust laws. *See Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004); *International Business Machines Corp. v. Platform Solutions, Inc.*, 658 F.Supp.2d 603, 613–14 (S.D.N.Y.2009); *Campbell v. Austin Air Systems, Ltd.*, 423 F.Supp.2d 61, 67 (W.D.N.Y.2005). In such cases courts hold that while the termination may or may not be lawful under the parties' agreement, the decision to terminate does not violate the antitrust laws. *See Electronics Communications Corp. v. Toshiba America*

*Consumer Prods. Inc.*, 129 F.3d 240, 244 (2d Cir.1997); *S.W.B.*, 2008 WL 540091 *6. "The termination of one distributor of a product for another in a given market is not, standing alone, a violation of antitrust laws." *Id.*, quoting, *Agency Dev. Inc. v. Med. Am. Ins. Co. of New York*, 310 F.Supp.2d 538, 544 (W.D.N.Y.2004), *aff'd. mem.*, 142 Fed.Appx. 545 (2d Cir.2005). It is the absence of an adverse effect on market-wide competition that negates an antitrust claim based upon the termination of a distributorship. *Electronics Communications*, 129 F.3d at 244; *Oreck*, 579 F.2d at 133.

## II. Fido's Claims Are Dismissed Because They Fail to Allege Antitrust Injury

An examination of the facts here, and Fido's claims of anti-competitive behavior, reveals that this case fall squarely into the class of cases holding that the termination of a distributorship falls short of alleging injury to market competition, and therefore cannot support a claim of any antitrust violation. As demonstrated below, no set of facts proffered by Fido's in support of its allegations of anti-competitive exclusive terms, unlawful exercise of monopoly power, predatory pricing, or illegal tying support any claim of anti-competitive effect, and consequent antitrust injury that are sufficient to defeat Defendant's motion for summary judgment.

As noted, Plaintiff's claims stem primarily from the exclusive provisions of the parties' agreement. Although Plaintiff concedes, as it must, that there was no express limitation on the geographic area in which it was allowed to do business, it is alleged that the exclusive provisions of its now-terminated agreement with Canine violate the antitrust laws. Specifically, Fido's takes issue with the requirements in the agreement that Plaintiff sell only Ca-

nine products and Canine replacement products. Such terms are typical of exclusive distributor agreements, however, and are presumptively legal. *E & L Consulting, Ltd. v. Doman Indust. Ltd.,* 472 F.3d 23, 30 (2d Cir.2006); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA. Inc.,* 454 F.Supp.2d 62, 71, 72 (E.D.N.Y. 2006). It is only when such an agreement prevents a competitor's product from coming to market that an exclusive distributorship might violate the antitrust laws. *Union Cosmetic,* 454 F.Supp.2d at 72. There is, and can be no such allegation here. While Canine may have a bigger share of the electronic pet containment business than its competitors, that fact had nothing to do with its ability to terminate its own dealer for alleged breach of contract. Termination of a dealer who is in arrears is lawful, as is termination of a dealer who does not abide by conditions set by the distributor. *See Trans Sport. Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 189–91 (2d Cir.1992).

The facts here establish clearly that the replacement of Fido's as an Invisible Fence distributor with Canine has had no effect on the market for such products. Before the termination of Fido's, there was a single provider of Canine's Invisible Fence product in the area where Fido's did business. After that termination, there remained a single provider of that product. Consumers had the same access to the product both before and after Fido's termination. Similarly, consumers had the same access to the products of competitors. Accordingly, the court rejects the notion that the exclusive nature of Fido's now-terminated distributorship agreement is violative of the antitrust laws.

 Nor do any other of Fido's factual allegations support the claim of antitrust injury. As to its claims of attempted and actual monopolization, Fido's alleges that Canine has actual or close to monopoly power, and uses that power to force out its distributors, and fix and increase the price of its product. Even if the court were to accept the notion that Canine has monopoly power in the broad geographic market alleged (which market includes areas in which Fido's has never done business), any conduct exercised as a result of that power would have nothing to do with the nature of its dealer agreements. Where a manufacturer has monopoly power, prices can be increased with or without exclusive provisions in a dealership agreement. *E & L Consulting,* 472 F.3d at 30. If Canine chooses to deal with one dealer at the exclusion of another, it is merely an exercise of its contractual prerogative as a distributor and not an unlawful exercise of monopoly power. *Oreck,* 579 F.2d at 133; *Speed Auto Sales, Inc. v. American Motors Corp.,* 477 F.Supp. 1193, 1197 (E.D.N.Y.1979). Moreover, any increase in price by an alleged monopolist, would effect only the ultimate purchasers of Canine's product, and not any of its distributors. "A distributor no longer in the business of distributing goods is not injured by monopoly prices charged for those goods." *S.W.B.,* 2008 WL 540091 *4.

 Plaintiff's allegations regarding predatory pricing, which do nothing more than invoke the term "predatory pricing," with no factual amplification, fare no better as a vehicle for proving antitrust injury. A claim of predatory pricing is stated where a company sells its goods below cost in an effort to require a competitor to meet that price. When the competitor meets that price, it may be ultimately forced out of business. *See generally Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588–89, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Such a claim requires the contemporaneous sale of two products of like grade and

quality at different prices to competing purchasers for resale. *Volvo Trucks North America. Inc. v. Reeder–Simco GMC, Inc.*, 546 U.S. 164, 176–77, 126 S.Ct. 860, 163 L.Ed.2d 663 (2006). Like Plaintiff's other claims, the claim of predatory pricing asserted by Fido's pursuant to the Robinson–Patman Act, 15 U.S.C. § 13(a), requires a showing of injury to competition. *Volvo*, 546 U.S. at 175–76, 126 S.Ct. 860. There is no question but that at the time when Fido's was terminated, Canine had never before operated in the retail market on Long Island. Canine only began to sell its product after the termination of its agreement with Fido's. However, at no time were the two companies selling the same product in the same market. Therefore, Fido's could not possibly have been injured by any conduct with respect to the pricing of Canine's product. The facts make clear that Fido's was never in competition with Canine, and the termination of its distributorship agreement could have no effect on price. The parties' relationship belies completely any claim of predatory pricing. Moreover, to the extent that Plaintiff alleges unfair pricing of Canine's product in general, that allegation refers to the price that is ultimately paid by the consumer of Canine's product. Such consumer injury does not allege antitrust injury to Fido's, and does nothing to confer antitrust standing.

■ As to tying, Plaintiff's amended complaint again fails completely. At issue is the Defendant's advice that owners of their product purchase and use pre-approved batteries in their product, or potentially void their product warranties. Like Plaintiff's other claims, a claim of tying requires a showing of anti-competitive effect. *E & L Consulting*, 472 F.3d at 31. Plaintiff fails to show that the battery replacement requirement has any effect on market competition. Plaintiff also fails also to show any other element of a tying

claim. Importantly, there is no showing of consumer coercion resulting from any alleged tying arrangement. *See id.* (requiring showing of consumer coercion to support tying claim). Indeed, it is well settled that warranties that are not sold as a separate product do not result in consumer coercion if the warranty sets forth requirements. As here, the "manufacturer's recommendation is not the degree of coercion necessary to a tying arrangement." *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986) ("GM simply recommends use of [approved] fluid in its automatic transmissions and cautions that damage to transmissions cause by the use of other fluids may not be covered by the automobile warranty.").

■ The court turns to address Fido's allegation that Canine illegally acquired other dealerships as part of its overall anti-competitive scheme. Both parties have stated with specificity that Canine never acquired any dealers in the Long Island area, and that Fido's never attempted to be competitive outside that same geographic boundary. Canine appropriately argues that its acquisition of dealerships outside of the market where Fido's did business could have no effect on Fido's ability to compete. The unfounded allegation of acquisition of dealerships by Canine, to be replaced by direct Canine dealerships, does nothing to show antitrust injury. Such acquisitions even fail in their attempt to show injury to Fido's—which was, at no time, in competition with these business.

■ Finally, the court considers Fido's allegations that the non-compete clause in its dealership agreement violates the antitrust laws. Such a clause is not a *per se* violation of any law. To the extent that it "protects a legitimate business interest," and is "reasonable in both time and geographic scope," it will be upheld. *ServiceMaster Residential/Commercial Services*

*L.P. v. Westchester Cleaning Services, Inc.,* 2001 WL 396520, at *3 (S.D.N.Y. 2001); *see Carvel Corp. v. Eisenberg,* 692 F.Supp. 182, 186 (S.D.N.Y.1988) (upholding three-year, two-mile restriction on ice-cream store). So long as the restrictive covenant is not excessive "as to time, scope and area and is not unduly burdensome," it will be enforceable. *Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.,* 730 F.Supp. 1209, 1214 (E.D.N.Y.1990), quoting, *Meteor Indus. v. Metalloy Indus.,* 149 A.D.2d 483, 539 N.Y.S.2d 972, 974 (2d Dep't.1989).

The enforceability of this contractual provision will be decided at trial. The court will also decide whether it is appropriate to sever any unreasonable portion of the covenant. *Id.* (where restrictive covenant contains overly broad provisions, court may "make use of the tool of severance, paring an unreasonable restraint down to appropriate size and enforcing it") (citations omitted). For the purpose of this motion, however, suffice it to say that the presence of this clause does nothing to further Fido's claim of market-wide antitrust injury.

For the foregoing reasons, the court dismisses in their entirety all of Fido's Federal antitrust claims.

III. *New York and Connecticut State Law Antitrust Act Claims*

Absent a contrary state policy, New York's Donnelly Act and Connecticut's antitrust statute are patterned and interpreted in accord with federal antitrust law. *See Bologna v. Allstate Ins. Co.,* 138 F.Supp.2d 310, 320–21 (E.D.N.Y.2001) (New York law); *Westport Taxi Service, Inc. v. Westport Transit Dist.,* 235 Conn. 1, 15–16, 664 A.2d 719, 728 (1995) (Connecticut law). Fido's can point to no state policy allowing an antitrust plaintiff to proceed under state law where there is no injury to competition. Accordingly, the court dismisses the state law antitrust claims. Additionally, the lack of any connection of Fido's business to the state of Connecticut appears to prohibit application of that state's antitrust law. *See* Conn. Gen.Stat. § 35–30 (noting that Connecticut state antitrust law applies to antitrust violations that "was entered into or effectuated in whole or in part" in state of Connecticut).

*CONCLUSION*

For the foregoing reasons, the court grants Defendant's motion for summary judgment seeking dismissal of all antitrust claims in its entirety. The Clerk of the Court is directed to terminate the motions for summary judgment. The parties are reminded that trial of this matter is scheduled for March 8, 2010.

SO ORDERED.