**FIDO'S FENCES, INC., Plaintiff,**

v.

**RADIO SYSTEMS CORP. & Invisible Fences, Inc., Defendants.**

No. 2:12–cv–00179(NG)(JO).

United States District Court, E.D. New York.

Signed Feb. 27, 2014.

Filed Feb. 28, 2014.

See, also, 672 F.Supp.2d 303.

Karen H. Bromberg, Sandra C. McCallion, Scott D. Thomson, Cohen & Gresser LLP, New York, NY, for Plaintiff.

Louis L. Nock, Akin Gump Strauss Hauer & Feld LLP, New York, NY, Heather Hubbard, Paul S. Davidson, Waller Lansden Dortch & Davis, LLP, Nashville, TN, for Defendants.

## OPINION AND ORDER

GERSHON, District Judge:

Plaintiff Fido's Fences, Inc. ("Fido's") brings this action against defendants Radio Systems Corp. ("RSC") and Invisible Fence, Inc. ("Invisible Fence") under section 4 of the Clayton Act, 15 U.S.C: § 15, alleging principally that defendants monopolized and attempted to monopolize the market for electronic pet containment systems and three submarkets in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and refused to deal and tied the purchase of replacement batteries to the purchase of complete pet containment systems in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants move to dismiss the complaint as duplicative of a prior action between the parties, as precluded by collateral estoppel, and for failure to plead Article III and antitrust standing. For the reasons that follow, defendants' motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND [1]

Electronic pet containment systems use electronic collars to keep pets within a specified area without need for a physical fence. Such a system consists of antenna wiring, a radio receiver mounted on a collar designed to be worn by the pet, a radio transmitter, and batteries. The antenna

---

**1.** The following facts are taken from Fido's complaint and are assumed to be true for purposes of this motion. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

wiring is installed along the perimeter of the area within which the pet will be allowed to roam freely, and the radio transmitter is installed in the pet owner's home. As the pet approaches the buried antenna wire, the collar-mounted receiver is activated by the radio transmitter, which typically first emits a warning sound followed by a negative corrective stimulus.

Electronic pet containment systems were first introduced in the 1970s. Dealer-installed systems manufactured by Invisible Fence were initially covered by U.S. Patent No. 3,753,421 ("the '421 patent"). When the '421 patent expired in 1990, other companies, including Pet Stop, Innotek, Pet Safe, Multivet International, and Premier Pet Products, entered the market and competed vigorously for market share. Through a series of mergers and acquisitions in the 2000s, RSC acquired many of its competitors, including defendant Invisible Fence, Innotek, Pet Safe, Multivet International, and Premier Pet Products. RSC currently manufactures and sells these products under the PetSafe®, SportDOG®, and Innotek® brands. Through Invisible Fence, it also makes and sells Invisible Fence® brand products.

The U.S. market for electronic pet containment systems comprises three distinct submarkets: dealer-installed systems, do-it-yourself systems, and replacement batteries. Fido's alleges that RSC and Invisible Fence have a monopoly in the overall U.S. market and in each submarket. Specifically, defendants possess a 77% share of the dealer-installed submarket, a 92% share of the do-it-yourself submarket, and a 95% share of the replacement battery submarket. In total, defendants' sales account for $250 million of the $300 million in annual U.S. sales of electronic pet containment systems and replacement compo-

nents. Fido's further alleges that defendants maintain this dominant market share through anticompetitive means, including: requiring dealers to enter into contracts that forbid them from buying pet containment systems or replacement components from anyone other than Invisible Fence; falsely contending that the use of batteries other than their own may cause the equipment to fail; seeking to preclude competitors from using generic terms like "invisible" or "invisible fence" in advertising; and falsely marking products with patent claims and patent numbers. In the submarket for replacement batteries, defendants' conduct has almost completely foreclosed competition, allowing defendants to charge exorbitant markups.

Until 2008, Fido's was a local dealer and installer of electronic pet containment systems and replacement components manufactured by Invisible Fence. Since then, Fido's has sold systems manufactured by a competing manufacturer, DogWatch, Inc. ("DogWatch"). Beginning in February 2010, Fido's began to manufacture and sell replacement batteries that are compatible with defendants' receivers and collars. Because electronic pet containment systems typically last in excess of ten years, but batteries must be replaced quarterly, the sale of replacement batteries is an important and lucrative submarket, accounting for $83 million in annual sales, of which defendants' sales accounted for $76.5 million. Fido's has sold 10,000 to 20,000 units since entering the replacement battery submarket. Fido's also "intends to launch, in the [S]pring of 2012, its own receivers and collars to compete with RSC and Invisible Fence" (Compl. ¶ 102), but it has been hindered in its efforts to compete by defendants' anticompetitive conduct.

## II. PROCEDURAL HISTORY [2]

### A. Fido's Antitrust Suit Against Canine Fence

From 1991 until 2008, Fido's sold and installed Invisible Fence products pursuant to a dealership agreement with Canine Fence Company ("Canine Fence"), Invisible Fence's exclusive distributor in seven Northeastern states. *See Fido's Fences, Inc. v. Canine Fence Co.*, 672 F.Supp.2d 303, 306–07 (E.D.N.Y.2009). After the parties' "business relationship was threatened by Fido's non-payment of monies allegedly due to Canine," Fido's sued Canine Fence. *Id.* at 306. Fido's sought an injunction preventing Canine Fence from terminating the parties' agreement, and it asserted antitrust and state law claims. *Id.* at 308. On November 30, 2009, the Honorable Leonard D. Wexler, district judge, granted summary judgment to Canine Fence on Fido's antitrust claims. *Id.* at 309–313. The parties subsequently settled Fido's remaining claims.

### B. Fido's *Qui Tam* Suit against RSC and Invisible Fence

On October 1, 2010, Fido's initiated a *qui tam* action under 35 U.S.C. § 292 against RSC and Invisible Fence, alleging that RSC and Invisible Fence had marked patent numbers on unpatented products "with the intent to deceive competitors and the consuming public and deter them from competing or purchasing competitive products." (Compl. ¶ 3, *Fido's Fences, Inc. v. Radio Systems Corp.*, No. 10–cv–4490, Dkt. No. 1 (E.D.N.Y. Oct. 1, 2010) (the "*Qui Tam* Action").) Fido's sought statutory damages of $500 for each offense, with one-half going to the United States

and one-half going to Fido's, and a declaratory judgment that defendants had falsely marked their products. (*Id.* ¶ 4, pp. 19–20 (Prayer for Relief).) The scheduling order in that action set a March 11, 2011 deadline for amending the pleadings. On September 16, 2011, after that deadline had passed, the America Invents Act revised 35 U.S.C. § 292 to eliminate the *qui tam* provision that permitted private plaintiffs, such as Fido's, to sue on behalf of the United States and recover statutory fines. *See* Leahy–Smith America Invents Act, Pub. L. No. 112–129, 125 Stat. 284 (2011). In January 2012, defendants refused Fido's request for consent to amend the complaint in that action to add antitrust claims.

### C. Fido's Antitrust Action against RSC and Invisible Fence

On January 13, 2012, rather than file a motion for leave to amend the complaint in the *Qui Tam* Action, Fido's filed its antitrust claims in this separate action. Fido's then sought to have the new action treated as related to and consolidated with the prior action. Defendants objected, arguing that, by filing a new action, Fido's was attempting to circumvent the court-ordered deadline for amending the pleadings in the *Qui Tam* Action, and indicated that they would move to dismiss the new antitrust action as duplicative of the prior action. On March 22, 2012, the parties stipulated to the dismissal with prejudice of the *Qui Tam* Action, but further stipulated that Fido's voluntary decision to dismiss the *Qui Tam* Action would not impact the parties' arguments with respect to any motion to dismiss the new action.

---

**2.** The facts recited here are taken from the various pleadings, court orders, and other court records from prior litigation submitted with the parties' briefing on this motion. Although these matters are outside the confines of the Fido's complaint, I take judicial notice

of these facts "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991).

## III. DISCUSSION

Defendants seek to dismiss the complaint on three independent grounds. First, defendants argue that dismissal is appropriate because this action is duplicative of the *Qui Tam* Action and was filed in violation of the scheduling order in that litigation and Rules 16(b)(4) and 15(a)(2) of the Federal Rules of Civil Procedure. Second, defendants argue that Fido's is collaterally estopped from bringing the antitrust claims asserted here because the court granted summary judgment against Fido's on the same claims in the *Canine Fence* litigation. Third, defendants move to dismiss on standing grounds, arguing that Fido's has failed to plead facts showing that it suffered injury-in-fact and antitrust injury on account of the allegedly anticompetitive conduct.

### A. Standing

#### 1. *Constitutional Standing*

■ Defendants' argument that Fido's lacks constitutional standing is reviewed under Federal Rule of Civil Procedure 12(b)(1). *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir.2011), A plaintiff bears "the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir.2003) (internal quotation marks omitted). Because defendants challenge plaintiff's standing on the basis of the pleadings, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir.2008), *aff'd*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) (citations and internal quotation marks omitted).

■ Constitutional standing is "the threshold question in every federal case"; if standing under Article III is lacking, then the court is without jurisdiction to entertain defendants' other arguments for dismissal. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir.2006). To establish Article III standing, a plaintiff must allege "an injury in fact" that is "fairly traceable" to the defendant's allegedly unlawful conduct and likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and alterations omitted). Although "[i]njury in fact is a low threshold," *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir.2008), plaintiff's asserted injury must be (a) "concrete and particularized" and (b) "actual or imminent," rather than "conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks omitted). Injury in fact also "requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

■ Fido's makes and sells replacement batteries that compete with the batteries sold by defendants. The complaint alleges that "[d]espite identical quality and price, ... Fido's Fences is unable to make meaningful inroads into the replacement battery submarket, because Defendants block fair competition." (Compl. ¶ 39.) The gravamen of these allegations is that Fido's has suffered injury to its "business or property," 15 U.S.C. § 15, in the submarket for replacement batteries as a result of defendants' exclusionary practices. This economic harm to Fido's business—*i.e.*, lost sales and profits—is sufficiently "concrete and particularized," as well as "actual or imminent," to constitute injury in fact under Article III. *See, e.g., Xerox Corp. v.*

*Media Sci. Int'l, Inc.*, 511 F.Supp.2d 372, 381–82 (S.D.N.Y.2007); *Alternative Electrodes, LLC v. Empi, Inc.*, 597 F.Supp.2d 322, 329 (E.D.N.Y.2009).

▮ With respect to the broader market for electronic pet containment systems, however, Fido's fails to assert a sufficiently concrete, actual, or imminent injury. Fido's does not allege that it has suffered harm as a manufacturer of either the dealer-installed or do-it-yourself systems.[3] Rather, Fidos's alleges that defendants have erected "unlawful barrier[s] to entry" that have impeded its plans to enter those markets. (Compl. ¶¶ 105–06.) Although "it is as unlawful to prevent a person from engaging in a business as it is to drive a person out of business," *Waldron v. British Petroleum Co.*, 231 F.Supp. 72, 81 (S.D.N.Y.1964) (internal quotation marks omitted), where a plaintiff alleges that defendant's exclusionary practices have prevented it from entering the market, it must allege facts showing that it was "ready, willing, and able" to enter the market but for the anticompetitive conduct. *Indium Corp. of Am. v. Semi–Alloys, Inc.*, 611 F.Supp. 379, 385 n. 14 (N.D.N.Y.1985) (emphasis omitted). "In determining whether a plaintiff has demonstrated [in its pleading] the requisite "intention and preparedness" to enter the market, courts consider the following factors: "(1) plaintiff's background and experience in the proposed business; (2) any affirmative action by plaintiff to engage in the activity; (3) plaintiff's ability to finance the enterprise; and (4) consummation of contracts to enter the business." " *Reaemco, Inc. v.*

*Allegheny Airlines*, 496 F.Supp. 546, 553–54 (S.D.N.Y.1980) (dismissing antitrust claims for failure to allege facts from which preparedness can be inferred); *see also Arista Records LLC v. Lime Group LLC*, 532 F.Supp.2d 556, 567 n. 13 (S.D.N.Y.2007); *Waldron*, 231 F.Supp. at 81–82.

Fido's makes the bare assertion that it "intends to launch, in the [S]pring of 2012, its own receivers and transmitters to compete with those of RSC and Invisible Fence," (Compl. ¶ 102), but it alleges no facts supporting any of the factors necessary to show that it was "ready, willing, and able" to enter the market. A plaintiff cannot establish injury in fact "if [it] has nothing beyond a hope or expectation of engaging in business." *Reaemco*, 496 F.Supp. at 554 (internal quotation marks omitted); *see also Lujan*, 504 U.S. at 564, 112 S.Ct. 2130 (holding that " 'some day' intentions[,] without any description of concrete plans," are insufficient to "support a finding of the 'actual or imminent' injury that our cases require"). Accordingly, Fido's lacks Article III standing to pursue its claims with respect to the market for electronic pet containment systems, and its claims are dismissed to the extent they relate to the monopolization of the market (or submarkets) for complete systems.

The remainder of this opinion addresses only Fido's claims as they relate to the alleged submarket for replacement batteries.[4]

---

**3.** Fido's sells electronic pet containment systems manufactured by DogWatch, a competitor of Invisible Fence and RSC (*see* Compl. ¶ 10), but it never argues that its status as a *seller* of DogWatch products gives it either Article III or antitrust standing to bring claims related to defendants' alleged monopolization of the market for such systems.

**4.** Plaintiff refers to replacement batteries for electronic pet containment systems as a "submarket" of the alleged market for electronic pet containment systems. For purposes of this motion, this opinion assumes, without deciding, that replacement batteries for electronic pet containment systems may constitute a distinct and independent product market for antitrust purposes.

### 2. *Antitrust Standing*

Although section 4 of the Clayton Act appears to confer a broad private right of action on "any person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15(a), it is well established that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (internal quotation marks omitted). A private plaintiff seeking to recover under the antitrust laws must plausibly allege "antitrust standing." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir.2013) (internal quotation marks omitted). Unlike Article III standing, antitrust standing requires the court to evaluate the merits of the action, *see Associated Gen. Contractors*, 459 U.S. at 535, 103 S.Ct. 897, and thus is typically addressed on a motion to dismiss for failure to state a claim, *see, e.g., Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir.2007) (evaluating antitrust standing under Rule 12(b)(6)).

A case will be dismissed under Federal Rule of Civil Procedure 12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

To establish antitrust standing, a plaintiff not only must allege injury-in-fact to its "business or property" caused by the antitrust violation, 15 U.S.C. § 15(a), but must also plausibly allege "(a) that it suffered a special kind of 'antitrust injury,' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Commc'ns*, 711 F.3d at 76 (2d Cir.2013) (internal quotation marks omitted). The Second Circuit employs a three-step process for determining whether a plaintiff has adequately alleged antitrust injury: the plaintiff first must allege that it has been injured by an illegal anticompetitive practice and "identify the practice complained of and the reasons such a practice is or might be anticompetitive"; the court then must "identify the actual injury the plaintiff alleges"; and finally, the court must consider how the "anticompetitive effect of the specific practice at issue" relates to "the actual injury the plaintiff alleges." *Gatt Commc'ns*, 711 F.3d at 76 (internal quotation marks and alternations omitted). This final step requires a showing that the injury to plaintiff's business or property "stems from a *competition-reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (emphasis in original).

Fido's alleges that defendants acquired a dominant share of the submarket for batteries not through natural growth or a superior product, but through a series of acquisitions of competing companies. Fido's further alleges that defendants maintain their dominant market share by anticompetitive means, including by requiring dealers to agree to exclusive dealing provisions, using false claims and anticompetitive warranties, and affixing patent claims and patent numbers to products

that are not covered by the patents in question. According to Fido's, these practices have erected barriers to entry and stifled competition in the submarket for replacement batteries, allowing defendants to charge exorbitant markups and preventing competitors from selling lower priced alternatives. Specifically, Fido's claims that, although it offers batteries of identical quality at a fraction of the price of those sold by defendants, defendants' exclusionary practices have impeded its ability to compete for market share, resulting in economic harm to Fido's. This type of market foreclosure is the kind of injury to competition that the antitrust laws were designed to prevent. *See, e.g., In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 688 (2d Cir.2009); 2 Areeda, Hovenkamp, & Blair, Antitrust Law ¶ 348 (2d ed. 2002) ("[A] rival has clear standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude competitors from the market.").

▬ Fido's also is a suitable plaintiff to pursue the alleged antitrust violations. To determine whether a putative antitrust plaintiff is an "efficient enforcer" of the antitrust laws, courts look to the following factors: (1) the directness or indirectness of the asserted violation; (2) whether other potential plaintiffs are more motivated to vindicate the public interest in antitrust enforcement; (3) whether the alleged injury is speculative; and (4) the difficulty of apportioning damages among direct and indirect victims so as to avoid duplicative recovery. *See Gatt Commc'ns,* 711 F.3d at 78. Each of these factors supports antitrust standing here.

With respect to the directness of injury, Fido's alleges that defendants' anticompetitive conduct, including their exclusive dealing contracts, false claims, and anticompetitive warranties has impeded Fido's ability to compete in the submarket for replacement batteries. The injury Fido's alleges—lost sales of its competing batteries and threatened exclusion from the marketplace—is a direct result of the alleged exclusionary conduct. As to the second factor, motivation, defendants argue that consumers would more fittingly vindicate the public interest in antitrust enforcement, because only consumers are interested in lowering the price of replacement components. This factor, however, does not require plaintiff to be the "entity most motivated by self-interest" to bring suit; rather, it "simply looks for a class of persons naturally motivated to enforce the antitrust laws." *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d at 689. Fido's natural economic self-interest in selling, and profiting from the sale of, replacement batteries provides a significant motivation to challenge defendants' alleged anticompetitive conduct. *See, e.g., Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.,* 850 F.2d 904, 913 (2d Cir.1988). In addition, consumers of replacement components are less likely to sue than a competitor because of the more widely dispersed nature of the harm. The cases on which defendants rely in arguing that competitors such as Fido's lack sufficient motivation to protect competition are entirely inapposite; unlike *Daniel v. Am. Bd. of Emergency Med.,* 428 F.3d 408, 444 (2d Cir.2005), and *Shaywitz v. Am. Bd. of Psychiatry & Neurology,* 675 F.Supp.2d 376, 388 (S.D.N.Y.2009), Fido's is not seeking an injunction permitting it to join an alleged cartel "in order to share in the super-competitive remuneration allegedly made possible by [the carters] exclusivity." *Daniel,* 428 F.3d at 444. Rather, the injunctive relief sought here would remove alleged restraints on free competition "such that [plaintiff's] interest coincides with the public interest in vigorous competition." *Id.*

Turning to the third factor, defendants argue that plaintiff's alleged injury is en-

tirely speculative because Fido's would suffer injury only if it ever begins production of electronic pet containment systems. As discussed above, although Fido's lacks standing to pursue claims relating to complete systems, it currently sells replacement batteries for such systems in direct competition with defendants. Given the allegation that defendants have restrained competition in that submarket, the resulting injury to Fido's is not unduly speculative. Although it may be difficult to account precisely for the effect of the alleged restraints on trade, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 689. As for the fourth factor, there is little risk of any difficulty in apportioning damages so as to avoid duplicative recovery in the event that consumers were to bring suit for the same alleged violations. A suit by consumers, if viable, would be seeking overcharge damages, not lost profits. In the unlikely event that defendants are faced with multiple suits, these two conceptually different measures of damages "can be fairly apportioned in order to avoid duplicative recovery." *Id.*

Therefore, I find that Fido's has sufficiently alleged that it is a proper party to bring this antitrust action.

## B. Duplicative Litigation

 Defendants argue that that this action is duplicative of the *Qui Tam* Action between the same parties and must be dismissed. This argument is properly raised on a 12(b)(6) motion. *See, e.g., BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, No. 10–cv–8630, 2011 WL 3847376 (S.D.N.Y. Aug. 30, 2011).

 "As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of

another federal court suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000). The power of the court to dismiss duplicative litigation is "meant to foster judicial economy and the comprehensive disposition of litigation" and "to protect parties from the vexation of concurrent litigation over the same subject matter." *Id.* (internal quotation marks omitted). A duplicative suit does not, however, necessarily require dismissal of the later-filed action; such situations "do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion." *Id.* "Because of the obvious difficulties of anticipating the claim or issue-preclusion effects of a case that is still pending, a court faced with a duplicative suit will commonly stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or consolidate the two actions." *Id.*

 Here, however, the court presently is not faced with multiple actions. After filing this antitrust action, Fido's dismissed the prior *Qui Tam* Action with prejudice. Although the parties stipulated that the voluntary dismissal of the *Qui Tam* Action would "not render moot" any arguments advanced in support of dismissal of the antitrust action, that stipulation cannot change the fact that there is currently only one lawsuit pending before the court and that the threat of duplicative litigation no longer exists.

Defendants nonetheless argue that, by filing its antitrust claims in a new action rather than seeking leave to amend the complaint in the *Qui Tam* Action, plaintiff is attempting to circumvent the scheduling order in that action and the requirement that a motion for leave to amend filed after the deadline set for amendment of pleadings be supported by "good cause." *See* Fed. R. Civ. Proc. 16(b)(4); *Parker v.*

*Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir.2000). Although ordinarily we expect a plaintiff to bring all its related claims in a single lawsuit, no Federal Rule of Civil Procedure required plaintiff to move for leave to amend rather than file a new complaint. *See, e.g., N. Assurance Co. of Am. v. Square D Co.*, 201 F.3d 84, 90 (2d Cir.2000) (refusing to dismiss separate action filed after denial of motion to amend and observing that plaintiff "cannot be faulted for deciding to institute a separate suit, something it had a right to do initially"). Fido's patent marking claims were negatively impacted by a change of law occurring after the deadline for amendment had passed; the Leahy–Smith America Invents Act, which was signed into law on September 16, 2011, eliminated the *qui tam* provisions of 35 U.S.C. § 292, on which Fido's had relied in bringing that action, and required that private plaintiffs show competitive injury. Defendants refused Fido's subsequent request for consent to amend the complaint to add substantive antitrust claims. Given that refusal, I see no reason why Fido's should have invited litigation over an amendment of a complaint it was otherwise dismissing instead of filing a new complaint.

▮ A plaintiff's decision to dismiss an action with prejudice, instead of seeking leave to amend, is, of course, not without consequences. In addition to the potential res judicata effect of the dismissal of the first action, discussed below, the filing of a new complaint subjects the plaintiff to a new statute of limitations. That Fido's elected a procedural route different from seeking to amend its complaint in the *Qui Tam* Action does not justify denying it the opportunity to litigate a potentially meritorious claim. *See, e.g., N. Assurance*, 201 F.3d at 89–90; *Foman v. Davis*, 371 U.S. 178, 181–182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("mere technicalities" should not prevent cases from being decided on the merits). Under these circumstances, I do

not find that plaintiff's decision to file a new action to pursue its antitrust claims was motivated by bad faith or was an improper "end run" around Rule 16(b)(4)'s good faith requirement or the scheduling order in the *Qui Tam* Action. In sum, dismissal on duplication grounds is not warranted.

Defendants also argue that the antitrust action should be dismissed because a plaintiff "must bring all claims against the same defendant relating to the same event in a single lawsuit." *N. Assurance*, 201 F.3d at 88. According to defendants, plaintiffs antitrust claims are transactionally related to the *Qui Tam* litigation, as both actions are premised on defendants' alleged false marking of battery packs to maintain their dominance in the marketplace. Although defendants do not directly invoke the doctrine of claim preclusion, or res judicata, in support of dismissal of plaintiff's claims, the Second Circuit cases on which they principally rely, *Northern Assurance* and *Curtis*, explain that the bar against bringing additional claims against the same defendant in a second suit "turns on normal principles of claim preclusion, *i.e.*, whether [plaintiff] was required to bring its claims in the initial suit." *N. Assurance*, 201 F.3d at 88; *see also Curtis*, 226 F.3d at 139–40.

▮ Under the doctrine of claim preclusion, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1463 (2d Cir.1996) (quotation marks omitted). There is no question that plaintiff's voluntary dismissal with prejudice of the *Qui Tam* Action operates as a final judgment on the merits for purposes of claim preclusion. *Chase Manhattan, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir.1995). Whether Fido's was required to raise its antitrust claims in the

*Qui Tam* litigation "depends *in part* on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d Cir.2002) (internal quotation marks omitted) (emphasis in original). "Also dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would impair or destroy rights or interests established by the judgment entered in the first action." *Id.* (internal quotation marks omitted).

■■■ A comparison of the underlying facts necessary to support each action reveals that Fido's antitrust claims do not arise from the same transactions at issue in the *Qui Tam* Action. The *Qui Tam* Action was limited to defendants' alleged practice of falsely affixing patent claims and patent numbers to products that were not covered by the patents in question. Under 35 U.S.C. § 292, Fido's sought statutory damages for each offense and a declaratory judgment that defendants had falsely marked their products. Under the false marking statute in effect at that time, the evidence needed to support that claim was limited to whether defendants marked unpatented articles and whether they intended to deceive the public. *See Forest Group, Inc. v. Bon Tool Co.*, 590 F.3d 1295, 1300 (Fed.Cir.2009). To the extent the complaint in the *Qui Tam* Action described anticompetitive conduct other than false patent marking (*see Qui Tam* Action, Compl. ¶¶ 54–58), the alleged facts were not necessary to support plaintiff's claims in the first action; rather, they merely provided context to plaintiff's specific allegation in the *Qui Tam* Action that defendants' false marking of electronic pet containment system components was intended to deceive the public into thinking that these components were covered by one or more valid patents.

By contrast, the facts underlying Fido's antitrust suit arise from a much broader and more pervasive pattern of conduct than the limited inquiry into patent markings at issue in the *Qui Tam* Action. The key question in Fido's antitrust action is whether defendants monopolized, or attempted to monopolize, the submarket for replacement batteries. In addition to false patent marking, Fido's alleges that defendants acquired or maintained monopoly power through the acquisition of competing companies, the use of restrictive contracts that require its dealers to purchase all replacement components only from defendants, and the use of false claims and anticompetitive warranties to maintain their dominant share of the submarket for replacement batteries. A finding that defendants unlawfully restrained trade in this submarket would not "impair or destroy" any rights established by the dismissal of the *Qui Tam* Action, which related only to defendants' potential liability for false patent marking. Moreover, in comparing the scope of evidence needed to establish Fido's antitrust claims with the focused nature of the *Qui Tam* Action, it is evident that the antitrust inquiries into market definition, monopoly power (including defendants' share of the relevant product market), and the willful acquisition or maintenance of that power would have required different discovery and witnesses and would have related to conduct different from the false marking at issue in the first suit. In sum, because the antitrust action springs from a distinct and significantly broader series of transactions, it is not barred by Fido's voluntary dismissal of the *Qui Tam* Action.[5]

---

**5.** The parties did not engage in a claim by claim analysis of the preclusive effect of plain-

tiff's voluntary dismissal with prejudice of the *Qui Tam* Action. Plaintiff should be prepared

## C. Issue Preclusion

█ Finally, defendants contend that Fido's antitrust claims must be dismissed because they are premised on factual allegations that are substantially similar to those asserted by, and decided against, Fido's in the *Canine Fence* litigation. A court may dismiss a claim on collateral estoppel grounds on a Rule 12(b)(6) motion. *Conopco, Inc. v. Roll. Intern.*, 231 F.3d 82, 86 (2d Cir.2000).

█ Collateral estoppel, or issue preclusion, applies when "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *NLRB v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir.1999) (quotation marks omitted). The issues in the two proceedings need not be "exactly identical; it is sufficient that the issues presented [in the earlier litigation] are substantially the same as those presented by the [later] action." *Zherka v. City of New York*, 459 Fed.Appx. 10, 13 (2d Cir.2012) (internal quotation marks omitted).

Whether collateral estoppel applies here principally depends on whether there is sufficient identity between the issues actually litigated and decided in *Canine Fence* and those presented in this case. The *Canine Fence* litigation arose out of a contract dispute between Fido's and Canine Fence. Fido's was "a long time retail seller, and installer of electronic pet containment systems [made by Invisible Fence and] distributed by [Canine Fence]." *Canine Fence*, 672 F.Supp.2d at 306. After Fido's account fell into arrears,

Canine Fence "put Fido's account 'on hold,' [ ] refused to supply additional material to Fido's," and ultimately terminated the parties' dealership agreement. *Id.* at 308. Fido's brought an action against Canine Fence, seeking to prevent Canine Fence from terminating the parties' dealership agreement and alleging, *inter alia*, violations of the antitrust laws. *Id.* at 308–09. The court dismissed Fido's antitrust claims, holding that Fido's had failed to allege "injury to market competition." *Id.* at 310.

Defendants identify four issues that they argue were decided against Fido's in the *Canine Fence* litigation and that Fido's is attempting to reassert here. Defendants first contend that the *Canine Fence* decision estops Fido's from asserting that "unfair pricing . . . of replacement batteries constitutes antitrust injury." (Mem. at 20.) But Fido's does not allege here, as it did in *Canine Fence*, that it has suffered antitrust injury on account of the inflated prices paid by consumers for replacement batteries. Rather, to the extent the complaint invokes defendants' ability to charge "exorbitant markups" on their replacement batteries (*see* Compl. ¶¶ 36–37), it appears to do so only as evidence of defendants' market power. *See, e.g., Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir.1998) (market power "may be proven directly by evidence of the control of prices"). Plaintiff's contentions regarding the pricing of replacement batteries are not barred by collateral estoppel.

Second, defendants contend that Fido's is precluded from alleging that their acquisition of pet containment system dealers is anticompetitive. In *Canine Fence*, the court held that Canine Fence's acquisition

---

to address at the next conference why its claim for injunctive relief for patent mismarking (Count VII) should not be dismissed on res judicata grounds. *See Scherer v. Equitable* *Life Assurance Soc'y of the United States*, 347 F.3d 394, 398 n. 4 (2d Cir.2003) ("[A] court is free to raise [res judicata] *sua sponte*, even if the parties have seemingly waived it.").

of dealerships outside the market where Fido's did business could not have injured Fido's business, as it was never in competition with these other dealers. 672 F.Supp.2d at 312. Here, by contrast, Fido's alleges that defendants' acquisition of competing manufacturers has given them monopoly power in the market for replacement batteries and that defendants' conduct has harmed Fido's in its business as a manufacturer of replacement batteries. (Compl. ¶¶ 30–35.) Because the issues are not substantially identical, collateral estoppel does not apply.

Third, defendants argue that Fido's is precluded from asserting that Invisible Fence's dealership contracts—which require its dealers to purchase all of their pet containment systems and components only from Invisible Fence and prohibit them from competing with Invisible Fence for a two-year period following termination of a dealership contract—are anticompetitive. In *Canine Fence,* Fido's, then a local dealer of Invisible Fence products, alleged that its Distributor Dealer Agreement with Canine Fence, a regional distributor, contained exclusionary provisions in restraint of trade. *Canine Fence,* 672 F.Supp.2d at 309. Although the court suggested that any anticompetitive "conduct exercised [by Canine Fence] as a result of [its monopoly] power would have nothing to do with the nature of its dealer agreements," *id.* at 311, it did not hold that the exclusionary provisions in Canine Fence's dealership agreement could never violate the antitrust laws. Rather, the court found that, absent any allegation that the challenged provisions "prevent[ed] a competitor's product from coming to market," Fido's had failed to allege the necessary harm to market competition needed to show antitrust injury. *Id.* at 311. Here, by contrast, Fido's brings antitrust claims as a competing manufacturer of batteries and makes exactly the allegation that was missing in *Canine Fence:* that RSC and

Invisible Fence have restrained trade in the submarket for replacement batteries by foreclosing competition.

Defendants dispute that the *Canine Fence* litigation was limited to a dispute between a local dealer and its distributor. According to defendants, Fido's had begun selling products manufactured by one of Invisible Fence's competitors prior to summary judgment and was thus "a direct competitor" of Canine Fence. (Reply at 8.) This argument is unpersuasive for two reasons. First, Fido's sale of products made by DogWatch was relevant to the court's decision only insofar as it constituted a potential violation of the parties' noncompete agreement. *See* 672 F.Supp.2d at 308, 312–13. Second, the issue of whether Fido's suffered antitrust injury as a competing *manufacturer* on account of the exclusionary effect of defendants' dealership agreements was not "actually litigated and actually decided." *See id.* In *Canine Fence,* antitrust injury was lacking because the replacement of Fido's as a local dealer had no effect on market competition; "[c]onsumers had the same access to the [products distributed by Canine Fence] before and after Fido's termination," and "consumers had the same access to the products of competitors." *Id.* at 311. The *Canine Fence* decision does not preclude Fido's from alleging now that the exclusivity provisions in defendants' dealership contracts have prevented it, as a manufacturer of competing products, from making meaningful inroads in the submarket for replacement batteries.

 Finally, collateral estoppel *does* preclude Fido's from relitigating one issue that was decided in *Canine Fence.* Fido's alleges here that defendants have violated section 1 of the Sherman Act by tying the purchase of replacement parts, including batteries, to the purchase of electronic pet containment systems. This is-

sue is identical to the unlawful tying issue decided in *Canine Fence*, which was predicated on allegations that Canine Fence advised owners of their electronic pet containment systems to "purchase and use pre-approved batteries in their product, or potentially void their product warranties." *Canine Fence*, 672 F.Supp.2d at 312. A plaintiff alleging an illegal tying arrangement under section 1 of the Sherman Act must show, among other elements, "a tying and a tied product," "evidence of actual coercion by the seller that forced the buyer to accept the tied product," and "anticompetitive effects in the tied market." *E & L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir.2006) (citation omitted). *Canine Fence* held that Fido's had "failed to show that the battery requirement has any effect on market competition." 672 F.Supp.2d at 312. The court also held that conditioning the product warranties on the use of approved batteries did not establish the degree of actual consumer coercion needed to support a tying claim. *Id.* (explaining that "[i]t is well settled that warranties that are not sold as a separate product do not result in consumer coercion if the warranty sets forth requirements").

▆▆▆ In arguing that issue preclusion should not apply, Fido's suggests only that the court in *Canine Fence* did not consider the coercive effect on consumers of defendants' allegedly false statements regarding the consequences of using competing batteries. Although "changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues," *Montana v. United States*, 440 U.S. 147, 159, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), this exception "applies only when these changes 'significant[ly]' affect the overall complexion of the record." *Hickerson v. City of New York*, 146 F.3d 99, 112 (2d Cir.1998) (quoting *Montana*, 440 U.S. at 157, 99 S.Ct. 970). That standard is not met here. A party cannot avoid collateral estoppel *on* an issue merely by asserting additional facts—here, that defendants falsely warned consumers that the use of unauthorized batteries could cause the collar-mounted receivers to operate erratically—that it could have argued in the prior action. Accordingly, the holdings in *Canine Fence* that Fido's had not shown any effect on market competition or the "actual coercion" needed to sustain an unlawful tying claim collaterally estops Fido's from relitigating its tying claim in this action.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for lack of Article III standing is GRANTED as to Fido's claims relating to the monopolization or attempted monopolization of the market for electronic pet containment systems. The only remaining claims relate to defendants' allegedly anticompetitive conduct with respect to the submarket for replacement batteries. Defendants' motion to dismiss is also GRANTED as to Count III (Tying) in its entirety and Count VI (Injunctive Relief for Anticompetitive Warranties and False Claims) as it pertains to the tying of product warranties to the use of defendants' replacement batteries. The motion to dismiss is DENIED as to all other claims relating to replacement batteries.

**The parties are directed to appear for a conference on April 8, 2014 at 10:30 a.m.**

SO ORDERED.